United States Court of Appeals,

Fifth Circuit.

No. 93-1097.

Daniel P. ROBINOWITZ, Plaintiff-Appellant,

v.

GIBRALTAR SAVINGS, et al., Defendants,

FGMC Investment Corp., Shawmut First Mortgage Corp., f/k/a First Gibraltar Mortgage Corp., and Resolution Trust Corporation, as receiver for Gibraltar Savings, Defendants-Appellees.

June 28, 1994.

Appeal from the United States District Court for the Northern District of Texas.

Before POLITZ, Chief Judge, KING and DAVIS, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Daniel Robinowitz appeals the district court's grant of summary judgment to the RTC based on its holding that all of Robinowitz's claims are barred by the *D'Oench Duhme* doctrine. We affirm.

I.

In 1983, Daniel Robinowitz (Robinowitz) approached Gibraltar Savings for financing. He and FGMC Investment Corporation (FGIC) entered into a partnership to purchase land for the development of the Galleria project, a "multi-use" development to be built in several phases in Metaire, Louisiana. FGIC was the subsidiary of First Gibraltar Mortgage Corporation (Shawmut).[1] Shawmut was the

---

[1] In December 1986, Gibraltar Savings sold the stock of First Gibraltar Mortgage Corporation to Shawmut Bank who later sold its stock to El Paso Federal Savings Association. In 1991, the RTC was appointed receiver for El Paso.

1

subsidiary of Gibraltar Savings. Gibraltar Savings provided $9 million of financing for the purchase.

In 1985, Galleria Land, Ltd., a limited partnership with Robinowitz as one of its managing general partners, entered into a joint venture with FGIC to hold the land purchased for the Galleria project. FGIC also entered into a joint venture with Galleria Phase I., Ltd., also a limited partnership with Robinowitz as one of its managing partners, to develop the first phase of the Galleria project. The joint venture agreements provided for joint control and provided that Galleria Phase I, Ltd. was primarily responsible for the development and management of the first phase while FGIC was primarily responsible for obtaining financing for the project.

The first phase of the Galleria project included the construction of a hotel to be funded in part by Embassy Suites. After the construction of the hotel began, the New Orleans economy softened, and Embassy Suites refused to fund the hotel. Gibraltar Savings agreed to loan the additional money needed for the hotel in exchange for an increased ownership interest in it.

By 1986, serious disputes had developed between Robinowitz and FGIC and Gibraltar Savings. The RTC asserts that Robinowitz threatened to sue FGIC and Gibraltar Savings and that FGIC and Gibraltar Savings became concerned about their significant financial commitment to the project in the softening real estate market. The parties entered into discussions to settle their disputes. According to Robinowitz, Gibraltar Savings told him at

2

the settlement meeting that it was not going to continue to fund the hotel and that it was going to sell the Galleria project for whatever it could get. Robinowitz argues that because of these representations, he decided to sell his interest in the project to Gibraltar Savings.

Initially, Robinowitz agreed to sell his interest for $20 million. Gibraltar Savings refused to pay this amount, and Robinowitz contends that Gibraltar Savings pressured him into settling by instructing the contractor to stop working and by delaying progress payments and requests for reimbursement. Because Robinowitz was unable to meet his operating expenses and debt service, he agreed to sell his interest for $3.5 million.

Robinowitz then entered into a Settlement and Mutual Release Agreement with Gibraltar Savings, Shawmut and FGIC. In that agreement, Gibraltar Savings and its subsidiaries released Robinowitz from his obligations under the joint venture agreements. In return Robinowitz released FGIC and Gibraltar Savings from all claims and causes of action that Robinowitz had in connection with any "dealings, transactions, agreements or understandings" with any of the Defendants, "which have occurred prior to the date of this Mutual Release."

Robinowitz alleges that, contrary to its representations, Gibraltar Savings had no intention of selling the project, but instead intended to squeeze him out of the project. He alleges that the day before the parties executed the Settlement and Mutual Release Agreement, Gibraltar Savings hired a long-term manager for

3

the Galleria project.

Robinowitz filed suit in state court for breach of fiduciary duty, fraud, misrepresentation, and declaratory judgment against Gibraltar Financial of California (a holding company that owned all of Gibraltar Savings' stock),[2] Gibraltar Savings, Shawmut and FGIC. Robinowitz alleged that the Defendants breached their fiduciary duties to him by fraudulently inducing him to sign the release and to sell his partnership interests. Specifically, he alleged that the Defendants misrepresented their true plans regarding the Galleria project in order to induce him to sell his interest in the project for a price well below the real value.

In 1988, the state trial court granted Defendants' motion for summary judgment, ruling that Robinowitz's claims were foreclosed by the Mutual Release and Settlement Agreement. However, the Texas court of appeals reversed and remanded for trial, finding that a fact issue existed as to "whether Gibraltar made material misrepresentations which were fraudulent and in violation of its fiduciary duty."[3]

On October 30, 1989, the RTC was appointed receiver for Gibraltar Savings and intervened in the state court action, removing it to district court. The RTC, Shawmut, and FGIC then filed a motion for summary judgment on the grounds that

---

[2]Gibraltar Financial settled with Robinowitz and was dismissed in February 1993.

[3]The Texas Court of Appeals labeled the Defendants collectively "Gibraltar." Thus, it is unclear which Defendants the court determined owed a fiduciary duty to Robinowitz.

Robinowitz's claims were barred by the *D'Oench, Duhme* doctrine and related statutes.  The district court granted Defendants' motion, holding that because Gibraltar Savings' misrepresentations did not appear in the Settlement and Mutual Release agreement or on any document on file with Gibraltar Savings, Robinowitz had "lent himself to a scheme or arrangement whereby banking authorities are likely to be misled."  Robinowitz timely appealed.

## II.

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) (citations omitted).  If the non-movant is faced with a motion for summary judgment "made and supported" as provided by Rule 56, the non-movant cannot survive the motion by resting on the mere allegations of its pleadings.  See *Id.; Slaughter v. Allstate Ins. Co.,* 803 F.2d 857, 860 (5th Cir.1986).

Robinowitz makes several arguments as to why *D'Oench Duhme* should not apply to this case.  First, he contends that *D'Oench Duhme* does not apply because the suit does not involve a note or debt.  Second, he argues that the doctrine does not apply to bar claims for breach of fiduciary duty.  Next, he argues that D'Oench Duhme does not bar his claims against FGIC and Shawmut because they

5

are subsidiaries of a failed insured savings and loan institution and not entitled to the jurisprudential and statutory bar. Robinowitz then argues that the RTC's knowledge at the time of suit serves to preclude application of *D'Oench.* Finally, Robinowitz argues that the transaction, the settlement of real estate partnership agreements with a lender, is not a banking function and is therefore not covered by *D'Oench Duhme.* We consider these arguments below.

III.

A.

Robinowitz first argues that the *D'Oench Duhme* doctrine and § 1823 of FIRREA should not apply to bar his claim for breach of fiduciary duty because that claim is unrelated to a note or debt.[4] According to Robinowitz, *D'Oench Duhme* applies only when a party is attempting to use an unrecorded agreement as a defense to collection efforts by a receiver of a debt or obligation.

Our cases do not support Robinowitz's argument for such a narrow application of *D'Oench Duhme.* We have held that *D'Oench Duhme* also applies in a case "with an affirmative claim, against

---

[4]Section 1823 of FIRREA is the statutory codification of the common law *D'Oench Duhme* doctrine. It provides that "[n]o agreement which tends to diminish or defeat the interest of the Corporation in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement—1) is in writing, 2) was executed by the depository institution ... 3) was approved by the board of directors of the depository institution or its loan committee, ... and 4) has been, continuously, from the time of its execution, an official record of the depository institution." 12 U.S.C. § 1823(e) (1989).

FDIC-Receiver, with no note whose terms are subjected to a secret protocol." *Bowen v. FDIC,* 915 F.2d 1013, 1015 (5th Cir.1990); *see also Beighley v. FDIC,* 868 F.2d 776, 783-84 (5th Cir.1989) (holding that *D'Oench Duhme* barred the plaintiff's claims for breach of contract, breach of fiduciary duty, promissory estoppel, and fraud arising from an unwritten agreement by the bank to finance a third party's purchase of collateral from the plaintiff).

Robinowitz's argument that *D'Oench Duhme* has no application because the suit is not related to a note or debt is therefore without merit.

B.

Robinowitz next argues that although courts have, in dicta, purported to apply *D'Oench Duhme* to bar claims for breach of fiduciary duty where no fiduciary relationship was proven, no cases have held that *D'Oench Duhme* bars claims for breach of fiduciary duty where the fiduciary relationship is established. He argues that the fiduciary relationship has been established here because he and the Defendants entered written partnership agreements. He argues that his claim is based on these agreements, not Defendants' oral assertion that they were going to stop financing the project.

We disagree. Even assuming proof of a fiduciary relationship,[5] Robinowitz's claims are based not on any partnership

---

[5]The RTC argues that there is no fiduciary relationship between Gibraltar Savings and Robinowitz because Gibraltar Savings was not a party to any of the joint ventures and argues there is no fiduciary relationship between Robinowitz and Shawmut because Shawmut was a partner only under the 1983 joint venture that terminated in 1985. However, the Texas court of appeals in reversing the state court's grant of summary judgment to the bank

7

agreements but on Defendants' alleged oral misrepresentation during the settlement meeting about their future intentions to immediately dispose of the Galleria project. According to Robinowitz, this alleged representation induced him to sign the Settlement Agreement. The alleged misrepresentation was not written or recorded according to the requirements of § 1823.

Robinowitz's claim is analogous to one for fraudulent inducement which is barred by *D'Oench Duhme*. *Langley v. FDIC,* 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987). In *Langley,* the plaintiffs claimed that the Bank fraudulently induced them to borrow funds to invest in property by orally misrepresenting the size of the property. The Court held that the oral misrepresentation regarding the nature of the property was sufficient to constitute an "agreement" within the meaning of § 1823. *Id.* at 92, 108 S.Ct. at 401. It then held that even if the misrepresentation was fraudulent, § 1823 still barred a claim based on the representation unless it met the recording requirements. *Id.* at 93-94, 108 S.Ct. at 402. Robinowitz's claim that an oral misrepresentation fraudulently induced him to enter the settlement agreement, like the Langleys' claim that the bank's oral misrepresentation regarding the property induced them to borrow funds, is also barred by *D'Oench Duhme. See also, FDIC v. Payne,* 973 F.2d 403 (5th Cir.1992) (*D'Oench Duhme* doctrine bars Payne's

found that there was a fact issue as to "whether [defendants] made material misrepresentations which were fraudulent and in violation of its fiduciary duty." The district court did not discuss whether Robinowitz had established a fiduciary duty between himself and Defendants.

claim of fraudulent inducement based on bank's oral misrepresentation about financial condition of person Payne agreed to guarantee); *Beighley v. FDIC,* 868 F.2d at 784 n. 12 (*D'Oench Duhme* bars Beighley's claim for breach of fiduciary duty arising out of bank's alleged oral agreement to finance the purchase of collateral property).

## C.

Next, Robinowitz argues that even if *D'Oench Duhme* applies to bar claims based on fraudulent inducement, it does not bar claims against subsidiaries and sub-subsidiaries of protected institutions.[6] This circuit has not yet addressed whether subsidiaries may assert defenses available under *D'Oench Duhme. See, Alexandria Associates v. Mitchell,* 2 F.3d 598, 601 n. 10 (5th Cir.1993) (choosing not to address issue).

At least three other circuits have addressed this issue. All of them reached the conclusion that wholly-owned subsidiaries of failed institutions may also assert *D'Oench Duhme* defenses to bar claims based on secret or oral agreements. *See, Sweeney v. RTC*, 16 F.3d 1 (1st Cir.1994) (*D'Oench Duhme* extends to the financial interest of any wholly owned subsidiary of a failed institution); *Oliver v. RTC,* 955 F.2d 583, 585-86 (8th Cir.1992) ("*D'Oench* doctrine extends broadly to cover any secret agreement adversely affecting the value of a financial interest that has come within

---

[6]Shawmut was a wholly-owned subsidiary of Gibraltar Savings and FGIC was a wholly-owned subsidiary of Shawmut at the time of the events giving rise to Robinowitz's claims. Shawmut's stock was sold in 1989 to El Paso Savings Association, which was put into receivership in 1991.

the RTC's control as receiver of a failed financial institution" including the financial interest of wholly-owned subsidiaries); *Victor Hotel Corp. v. FCA Mortgage Corp.,* 928 F.2d 1077 (11th Cir.1991) (same).

We agree with our sister circuits that the *D'Oench Duhme* defense is available to wholly owned subsidiaries of the insured institution. Federal regulators have to "rely on a financial institution's records and its assets, such as wholly-owned subsidiaries, to determine solvency for regulatory purposes." *Victor Hotel,* 928 F.2d at 1083. They must be able to examine the records of the subsidiary, as well as the parent, especially since the subsidiary may constitute a major asset of the parent. Such reliance is necessary to enable the federal regulators to persuade solvent banks to assume the accounts of the failed institutions. Therefore, the district court correctly extended the *D'Oench Duhme* defense to Shawmut and FGIC.

### D.

Robinowitz next argues that if RTC has knowledge of the side agreement or secret promise, then *D'Oench Duhme* does not apply. Robinowitz asserts that the RTC knew about his claim at least two years before the RTC took over Gibraltar Savings. Robinowitz's suit had been pending against Shawmut for two years and had been appealed to the Texas appellate and Texas Supreme Court before RTC assumed Gibraltar Savings. However, the Supreme Court has already addressed this issue and held that knowledge by the FDIC is irrelevant:

> [K]nowledge of the misrepresentation by the FDIC prior to its acquisition of the note is not relevant to whether § 1823(e) applies.... An agreement is an agreement whether or not the FDIC knows of it.... The statutory requirements that an agreement be approved by the bank's board or loan committee and filed contemporaneously in the bank's records assure prudent consideration of the loan before it is made, and protect against collusive reconstruction of the loan terms by bank officials and borrowers.... Knowledge by the FDIC could substitute for the latter protection only if it existed at the very moment the agreement was concluded, and could substitute for the former assurance not at all.

*Id.* at 94-95, 108 S.Ct. at 402-403. *See also, Bell & Murphy v. Interfirst,* 894 F.2d 750, 753 (5th Cir.), *cert. denied,* 498 U.S. 895, 111 S.Ct. 244, 112 L.Ed.2d 203 (1990) (*D'Oench* bars claim even though lawsuit was filed against financial institution before it was declared insolvent). The key factor in the application of the *D'Oench Duhme* doctrine is whether the borrower "lent himself to a scheme or arrangement whereby banking authorities are likely to be misled." *Bowen v. FDIC,* 915 F.2d 1013, 1015 (5th Cir.1990) (quoting *D'Oench* ). Robinowitz lent himself to such a scheme or arrangement when he failed to include in the Settlement Agreement the alleged condition, that he was selling his interest in the project because Gibraltar Savings was withdrawing its support. *McMillan v. MBank Forth Worth, N.A.,* 4 F.3d 362, 368 (5th Cir.1993).

## E.

Finally, Robinowitz argues that the real estate partnership transactions at issue here are outside the traditional banking function, and therefore are not covered by *D'Oench Duhme.* He relies on the recent decision in *Alexandria Associates, Ltd. v. Mitchell Co.,* 2 F.3d 598 (5th Cir.1993), in which this court

11

declined to apply *D'Oench Duhme* to the commercial sale of partnership interests in a real estate development venture by a third generation subsidiary of a failed institution.

In *Alexandria,* the third generation subsidiary of Altus Bank, the Mitchells, formed limited partnerships to build, own and operate apartment building complexes through HUD financing. They sold partnership interests in the apartment complexes to plaintiffs, LaSala and Alexandria. Alexandria then attempted to syndicate its partnership interests, in order to pay off its purchase loan indebtedness, and when its attempts failed, sued the Mitchells alleging common law fraud and violations of state securities law based on the Mitchells' oral misrepresentations of the value of the property. *Id.* at 600. This court declined to extend *D'Oench Duhme* to these non-banking transactions: "[B]anks simply do not engage in the sale of partnership interests in real estate development ventures in the ordinary course of banking business."[7]

*Alexandria* is distinguishable from today's case and does not control it. Although Gibraltar Savings had a proprietary interest in the real estate at issue, its primary relationship with Robinowitz was as a lender. Unlike the parent bank in *Alexandria,* which did not make any loans on the project, Gibraltar Savings had about $100 million in outstanding loans on the Galleria project;

---

[7]This court recognized that a regulatory agency serving as a conservator or receiver of a failed institution might engage in liquidation of that bank's assets and be within the *D'Oench Duhme* doctrine. *Id.* at 603, n. 30.

12

including $69 million in permanent loan commitments and $9 million that Robinowitz borrowed to fund the original land purchase. Thus Gibraltar was performing a quintessential banking function. One of Robinowitz's main complaints is that Gibraltar Savings tightened the funding spigot to pressure him into selling his interest. The Defendants here sought to settle disputes over their financing of a project, not to make an ordinary commercial investment. Therefore, *D'Oench Duhme* applies to bar Robinowitz's claims. *OPS Shopping Center v. FDIC,* 992 F.2d 306 (11th Cir.1993) (*D'Oench Duhme* applies to bar claims involving ordinary banking transactions).

IV.

*D'Oench Duhme* applies to bar all of Robinowitz's claims based on alleged oral misrepresentations made by officers of a failed institution. We therefore AFFIRM the judgment of the district court.